Tom SMITH, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. 13026.

Court of Criminal Appeals of Oklahoma.

Sept. 20, 1961.

Rehearing Denied Feb. 7, 1962.

Certiorari Dismissed March 12, 1962.

See 82 S.Ct. 685.

Frank Grayson, Oklahoma City, W. B. Ward, Jr., Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

PER CURIAM.

This is an appeal from a conviction had in the district court of Seminole County, wherein the plaintiff in error, hereinafter referred to as defendant, was charged with the crime of burglary in the second degree, and subsequently sentenced to serve three years in the State penitentiary.

The information, filed in said court on September 25, 1959 charged this defend-ant, along with Joe Cortez and Donald Holmes Northcott, with breaking and en-tering the Chaney Drug, in the city of Wewoka, on July 14, 1959 and taking from said building certain personal property, consisting of one steel safe containing pa-pers and the sum of $100, and narcotics of the approximate value of $100; and ap-proximately the sum of $69 cash taken from a locked drawer in the prescription room of the drug store.

Subsequent to the filing of the informa-tion, and prior to the trial of this defend-ant, Joe Cortez had been convicted of this burglary and on three other counts of burglary, and sentenced to serve five years in the penitentiary, and at the time of the trial was confined at Granite, Oklahoma, in the state reformatory.

Donald Holmes Northcott had been turned over to the State of Texas where he was convicted on a charge of burglary, and was at that time confined in the State Penitentiary of that State, and the authori-ties refused to release him to be used as a witness in this case.

Also convicted in the same burglary were Benny Brown and Harry Weaver, Jr. Benny Brown received five years for his participation in the Chaney Drug store rob-bery, and was serving the same at Granite at the time of this trial. Harry Weaver, Jr., received a sentence of two years, and at the time of the trial was out of the peni-tentiary on parole, having served eight and a half months.

On December 14, 1960 the jury returned a verdict finding this appellant guilty of the burglary in the second degree, as charged in the information, and fixing his punishment at three years in the State penitentiary. Judgment and sentence was entered in accordance with the verdict, on December 20, 1960. Defendant duly per-fected his appeal, at the expense of the county.

On March 29, 1961 an order was entered by this Court giving defendant an addition-al 60 days within which to perfect his ap-peal. Casemade was filed herein on May

19, 1961. Brief was due to be filed within thirty days from that date, and the case was assigned for oral argument for July 26, 1961. No brief has been filed on behalf of the defendant, and no appearance was made at the time the case came on for oral argument.

■ This court has repeatedly held that where an appeal is taken and no briefs filed or argument presented, the court will examine the evidence to ascertain if it supports the verdict, and examine the pleadings, instructions of the court, and the judgment, and if no material error is apparent, the judgment will be affirmed. Fitzgerald v. State, 77 Okl.Cr. 409, 142 P.2d 131, and a long line of cases so holding.

However, the situation here being unusual, we have carefully read and considered the petition in error and the entire casemade. The defendant was a very able attorney, and at one time was county attorney of Seminole County.

In his petition in error the defendant sets out sixteen grounds for reversal. Most of them are frivolous.

Defendant alleges that the court erred in overruling the motion for new trial; that the verdict and judgment are not sustained by sufficient evidence and are contrary to the evidence; the verdict and judgment are contrary to law; that the court erred in admitting incompetent and prejudicial evidence against defendant; and that the court erred in refusing and ruling out competent and legal evidence offered by defendant.

The contention is made that the court erred in permitting the jury to separate during recess in the trial of the case.

■ We have carefully searched the record, and find that immediately after the jury was sworn, and before reading the information to them, the court recessed for noon. The record does not show that the jury was admonished, and no objection was made by the defendant. Yarbrough v. State, 13 Okl.Cr. 140, 162 P. 678; Rutherford v. State, 95 Okl.Cr. 311, 245 P.2d 96.

As in this case the defendant waived his right to object under the facts. No substantial right of the defendant was violated. Crabtree v. State, Okl.Cr., 339 P.2d 1066, certiorari denied 359 U.S. 990, 79 S. Ct. 1119, 3 L.Ed. 979.

■ When the court adjourned for the night, the jury was duly admonished, and no objection was made by the defendant to the separation of the jury, and the right to keep the jury together was waived. Hobson v. State, Okl.Cr., 277 P.2d 695.

The court took a recess after both sides rested, and the jury was fully admonished.

These are the only recesses shown by the record, and we must hold that there is no basis for defendant's contention.

■ The complaint is made that the punishment is excessive, and the result of passion and prejudice. The statute provides the punishment for conviction on a charge of burglary in the second degree (21 O.S.1951 § 1436) not to exceed seven years, and not less than two years. We do not consider the sentence of three years excessive.

There is no merit in the contentions that the court erred in overruling the defendant's motion to quash the information and his subsequent motion to quash, overruling the demurrer to the information and demurrer to the evidence and defendant's motion for a directed verdict. Heartsill v. State, Okl.Cr., 341 P.2d 625.

The defendant states that the trial court erred in not dismissing this cause for the reason that the defendant had demanded trial at the previous term of court and at a time this case was duly set for trial, which was refused. There is nothing in the record to indicate that the defendant ever demanded a trial.

■ The defendant contends that the court erred in misdirecting the jury as to the law, and not fully and correctly instructing the jury as to the law; in refusing defendant's Instruction No. 1; error of the court in not instructing the jury regarding and defining circumstantial evidence and corroborating evidence, and their relation-

ship with each other and the evidence in this case.

We find that the court fully instructed the jury as to the law in this case. The defendant made a blanket objection and exception to all the instructions. His one requested instruction was as follows:

"You are instructed that the proper rule to determine whether an accomplice has been corroborated is to eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witnesses or witness with the view to ascertain if there be inculpatory evidence—that is, evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no inculpatory evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him."

In refusing this instruction, the district judge made the notation thereof "Given in substance in Inst. No. 7."

We agree with this statement of the trial judge, and his instruction No. 7, together with instructions 5 and 6 fully cover this situation. The court did not give a specific instruction covering circumstantial evidence, but in numerous cases we have held that where circumstantial evidence alone is relied upon for conviction, the court should instruct on the law applicable thereto on his own motion, and that he must so instruct when requested by defendant, but that where the defendant has made no request for instruction on the law of circumstantial evidence, failure of the court to instruct does not constitute reversible error. Davidson v. State, Okl.Cr., 330 P.2d 607, and cases cited. The prosecution of this case was not based alone on circumstantial evidence, and we are of the opinion that the instructions given by the court amply covered the law with reference thereto. Condonnier v. State, 86 Okl.Cr. 291, 192 P.2d 298.

There is also complaint that the court should have granted a mistrial due to misconduct of the county attorney in his closing argument, which argument prejudiced the defendant's rights.

At the request of the defendant, the court reporter took the entire argument of the state, and we have carefully read and considered the same. We find a couple of places where the defendant objected to the remarks of the county attorney, but his objections were overruled, and we think the court was justified in so ruling.

The last contention is that the district court of Seminole County refused to make casemade for the defendant. This question is now moot, since this court ordered the casemade prepared, and the same is on file herein.

The evidence in this case discloses that four young men met in Seminole, Oklahoma and drove to the Top Hat Cafe in Wewoka in the early evening of July 13, 1959, and there met this defendant. Three of the boys, Joe Cortez, Benny Brown and Harry Weaver testified at defendant's trial, and the testimony of the other, Donald Holmes Northcott, taken at the preliminary hearing, was admitted in evidence and read to the jury. The four of them testified to practically the same state of facts—that they met the defendant at the Top Hat and went from there to the defendant's apartment in the Aldridge Hotel in Wewoka between 10:30 and 11 P. M., had a few drinks, and discussed burglarizing several places and finally decided on the Chaney drug store, next door to the hotel. All four of them stated that the defendant knew all about the inside of the drug store, and described the layout. Two of them testified that defendant got down on the floor of the apartment and with his fingers outlined the inside of the drug store, and just where the safe was located, the location of a money drawer, how the back door was fastened, etc. That they planned for Joe Cortez and Don Northcott to break in the back door, get the money in the money drawer, and roll the safe to the back door where it could be loaded in a car belonging to Northcott, which was parked in front of the

hotel. That the defendant Tom Smith and Harry Weaver were to take stations on the roof of the hotel and watch out for "the laws". Benny Brown was to remain in the hotel room until notified, then drive the car around the block and into the alley back of the drug store. That this plan was carried out, the five of them loaded the safe in the car, they all got in and drove north of Wewoka to a secluded spot, unloaded the safe, Don Northcott broke the hinges off, then the knob, they took a certain amount of narcotics, some silver dollars, about $100 in currency, deeds and other papers from the safe. They all testified that they burned the papers in the road then reloaded the safe, drove to the dam of Wewoka Lake, backed the car up and dumped the safe in the lake and threw the door in, returned to Mr. Smith's apartment in the Aldridge Hotel, and there divided the spoils, giving the silver dollars and narcotics to this defendant, and dividing the currency from the safe and the money taken from the cash drawer four ways.

These four witnesses all being accomplices, it becomes necessary that their testimony be corroborated.

The defendant testified in his own behalf and admitted that he was with Joe Cortez, Donald Northcott, and the other two boys whom he had never met until that night, at the Top Hat Cafe; that he left there between 11 and 12 o'clock with Carl Roper and returned to his apartment in the hotel; that Melba Holley came up in a few minutes and later the four boys came in, and that they had a few drinks. That Carl Roper and Melba Holley left, and the four boys stayed on for a while. This defendant had represented Joe Cortez and Donald Northcott in some criminal matters, and said that Northcott had a traffic ticket and came to talk with him about that. Defendant positively denied any conversation relative to a burglary, and that he had anything whatever to do with this burglary. His statements in this connection were very definite and positive.

Lee Chaney, the owner of the drug store, testified that he kept "hard" narcotics in the safe, and on the night in question had a bottle of quarter-grain morphine tablets, a bottle of morphine powder, a bottle of Dionin powder and some pure extract of liquid opium in the safe. That it also contained about $100 in currency, a number of silver dollars belonging to his daughter, his mother's will, some old deeds, cancelled notes and other papers. That the Western Union office was in the drug store, that their money and the daily intake from the drug store sales and some "class B" narcotics were in a drawer under the prescription counter, and the drawer had a pad-lock on it, and was locked. That there was $77 of the drug store money in the drawer, and he did not know the amount of the Western Union cash.

George McGuire, pharmacist, described the layout of the drug store, and manner of barring the back door at night.

This witness also testified that during the early part of June, 1959 he received a Western Union money order for Tom Smith, called him and he came by to pick it up between 5 and 6 o'clock one evening. The money order drafts were kept back in the prescription room, and Smith went back with witness. While witness was making out the draft Smith asked to use the rest room, which was near the back door, and permission was granted. Witness made out the draft, then filled a couple of prescriptions, and between ten and fifteen minutes having lapsed and Smith not having returned, witness went back to check on him. Smith was standing about six or eight feet from the back door, facing it, looking around. This was behind the prescription counter, and the stock-room, safe, etc., were located in the rear of the store. Witness told Smith his draft was ready, he took it and left.

He testified that at the time of the burglary there was between $200 and $300 in the Western Union drawer. He further testified about the condition of the back door after the burglary, the condition of

the floor where the safe had been rolled, and the lock broken off the money drawer.

Anna Head Scoggins, manager of the Aldridge Hotel, testified that the defendant had an apartment on the third floor of the hotel, that her apartment was in the rear on the ground floor, near the alley, and that the hotel ran back several feet further than the drug store next door, enough that she had three windows on the north side of her apartment, but that it was dark at the back of the drug store. That her dog awoke her at 12:45 the night in question, and she heard noises that "sounded like someone breaking in," and "heard this awful bumping" that she could not account for. She looked out towards the rear of the drug store, but could see no one.

Sheriff Nicholson testified to his investigation of the burglary, and that he went on the roof of the hotel and found where someone had been standing and had dropped cigarette butts. That the cigarettes had been recently smoked, showed that they had not been there long. They were "not weathered". The chief of police of Wewoka verified the sheriff in his description of the condition of the drug store, finding the cigarette butts on the roof, and where someone else had stood in another corner on the roof, the gravel on the roof showing that it had been recently disturbed.

The sheriff testified that in September Donald Northcott told him where the Chaney safe was, that the Highway Patrol emergency unit with diving equipment was secured; they drove to the lake, taking Northcott along, and he showed them where they stopped their car and rolled the safe off into the lake. That there was a rock wall along the edge of the dam, and scars and broken places on the rocks, and "It [the safe] was right where he showed me that it was." The door was ten or twelve feet further out in the lake. They recovered the safe and the door, and they were introduced in evidence and identified by the sheriff, Mr. Chaney, Mr. McGuire, and the accomplices.

The negro bell-boy at the hotel, who worked from 11 p. m. to 7 a. m. testified that he saw the defendant about midnight on July 13, and took him "and three or four other guys" and Melba Holley up in the elevator. That he saw three men leaving through the lobby door that night, but that "they had been coming up—in and out all of the time, and I never paid no attention." He identified Harry Weaver and said he had never seen him before that night, and identified Joe Cortez and had seen him three or four times before the night in question. He identified Benny Brown as one of the men he took up.

Carl Roper testified that he went from the Top Hat with Smith to his apartment between 11:30 and 12 o'clock the night of July 13, 1959, that Melba Holley came in within a few minutes; that three or four other boys who witness did not know came in, and witness left. That he was in the apartment about thirty minutes.

■ As hereinbefore stated, Joe Cortez, Donald Holmes Northcott, Benny Brown and Harry Weaver, Jr., being accomplices, it becomes necessary that their testimony be corroborated. We think there is ample corroboration in the record.

The defendant admitted that he saw the four boys at the Top Hat; that he left with Carl Roper and went to his apartment between 11 and 12 o'clock, and that Melba Holley and the four boys came there, that Roper and Melba left, and the boys remained for a while.

The gravel on the roof of the hotel in the two corners where accomplices said Smith and Harry Weaver stood as "lookouts for the law" showed that it had been recently disturbed as if by someone standing and moving around there, and fresh cigarette butts were also found on the roof.

■ It has been held that any fact which legitimately tends to connect defendant with the commission of a burglary is admissible for that purpose, such as familiarity of the defendant with the premises burglarized (People v. Davis, 1 Cal.App. 8, 81 P. 716) ; knowledge of the defendant concerning the

property in the building burglarized; his connection with the accomplices and his admissions and declarations. State v. Ward, 103 N.C. 419, 8 S.E. 814, 12 C.J.S. Burglary § 49, p. 721, note 88; 9 C.J. 1067 § 123, note 54; Clark v. State, Okl.Cr., 327 P.2d 509, at page 510; and authorities therein cited; Heartsill v. State, Okl.Cr., 341 P.2d 625–640.

In this connection also see Smith v. State, Okl.Cr., 278 P.2d 557, where in paragraphs 1, 2, 3 and 4 of the syllabus we said:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime. It is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

"Where there is evidence in corroboration of an accomplice tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury.

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

To the same effect are Scott v. State, Okl.Cr., 316 P.2d 192, and Hardesty v. State, Okl.Cr., 291 P.2d 351, involving conspiracies to defraud as defined herein. Rushing v. State, 88 Okl.Cr. 82, 199 P.2d 614, written by the late Judge Barefoot announced the same rules governing such cases.

In Plemons v. State, 53 Okl.Cr. 263, 10 P.2d 285, 287, in the body of the opinion we said:

"The law prescribes no standard for the strength of corroborating evidence, and there is failure to corroborate only if there is no evidence legitimately having that effect.

\*　　\*　　\*　　\*　　\*　　\*

" 'Trial courts in Oklahoma are limited in their power to interfere with the determination of issues of fact; and, where there are any facts from which the jury can legitimately deduce either of two conclusions, a motion to advise the verdict should always be denied, and the question of fact properly submitted under instructions given.' "

Under the record before us the evidence sustains the verdict of the jury. We cannot sustain the defendant's contentions, and the judgment and sentence is affirmed.